UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |
|---|---|
| STAR NEWS DIGITAL MEDIA, INC., MICHAEL PATRICK LEAHY, and MATTHEW D. KITTLE, <br><br> *Plaintiffs,* <br><br> v. <br><br> FEDERAL BUREAU OF INVESTIGATION, <br><br> *Defendant.* | Civil Action No. 3:23-cv-00467-AAT |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

I.     THE COVENANT SCHOOL SHOOTING AND ONGOING INVESTIGATIONS .........2

II.    PLAINTIFFS' FOIA REQUEST AND THIS CASE ........................................................4

LEGAL STANDARD ........................................................................................................5

ARGUMENT ....................................................................................................................7

I.     THE FBI ADEQUATELY SEARCHED FOR RESPONSIVE RECORDS......................7

II.    THE FBI PROPERLY WITHHELD RECORDS UNDER EXEMPTION 7(A). ..............9

       A.    The Responsive Records Were Compiled For Law Enforcement Purposes. ..........9

       B.    Disclosure Of The Responsive Records Could Reasonably Be Expected To Interfere With Enforcement Proceedings........................................................10

            1.    Defendant Has Established The Prospect Of Enforcement Proceedings. ...........................................................................................11

            2.    The Seidel Declaration Properly Identifies Records By Functional Category.......................................................................................13

            3.    Disclosure Of The Responsive Documents Could Reasonably Be Expected To Interfere With Ongoing Investigations And To Harm Potential Enforcement Proceedings..........................................14

            4.    Plaintiffs Cannot Overcome Defendant's Showing That Disclosure Is Likely To Harm Ongoing Law Enforcement Proceedings. .................18

       C.    No Reasonably Segregable Non-Exempt Information Exists. ............................21

III.   IF EXEMPTION 7(A) DOES NOT APPLY, THE FBI MAY STILL WITHHOLD PORTIONS OF THE RECORDS UNDER EXEMPTIONS 6, 7(C), AND 7(F)............22

       A.    Exemptions 6 And 7(C) Justify Withholding Names And Identifying Information. ......................................................................................................22

       B.    Exemption 7(F) Justifies Withholding Detailed Descriptions Of Hale's Plans. ............................................................................................................24

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*ACLU of Mich. v. FBI,*
  734 F.3d 460 (6th Cir. 2013) ..........................................................................*passim*

*Agrama v. IRS,*
  272 F. Supp. 3d 42 (D.D.C. 2017) ....................................................................14

*Alyeska Pipeline Serv. Co. v. U.S. EPA,*
  856 F.2d 309 (D.C. Cir. 1988) ..........................................................................16

*August v. FBI,*
  328 F.3d 697 (D.C. Cir. 2003) ............................................................................5

*Barrett v. U.S. DOJ,*
  No. 09-cv-02959, 2010 WL 4256366 (E.D. Cal. Oct. 21, 2010)....................11, 13

*Bigwood v. DOD,*
  132 F. Supp. 3d 124 (D.D.C. 2015) ..................................................................8-9

*Blackwell v. FBI,*
  680 F. Supp. 2d 79 (D.D.C. 2010), *aff'd,* 646 F.3d 37 (D.C. Cir. 2011) ...............12

*Butler v. Dep't of Air Force,*
  888 F. Supp. 174 (D.D.C. 1995), *aff'd sub nom. Butler v. U.S. AirForce,*
  116 F.3d 941 (D.C. Cir. 1997) ......................................................................12-13

*CareToLive v. FDA,*
  631 F.3d 336 (6th Cir. 2011) ..............................................................................6

*Carter v. U.S. Dep't of Com.,*
  830 F.2d 388 (D.C. Cir. 1987) ..........................................................................22

*Citizens for Resp. & Ethics in Wash v. DOJ,*
  746 F.3d 1082 (D.C. Cir. 2014) ......................................................... 6, 11, 13, 23

*Ctr. for Nat'l Sec. Stud. v. U.S. DOJ.,*
  331 F.3d 918 (D.C. Cir. 2003) ....................................................................17, 20

*Curran v. U.S. DOJ,*
  813 F.2d 473 (1st Cir. 1987)..............................................................................15

*Dillon v. U.S. DOJ,*
  102 F. Supp. 3d 272 (D.D.C. 2015) ...................................................................21

*Dickerson v. U.S. DOJ,*
  992 F.2d 1426 (6th Cir. 1993) ...................................................................*passim*

Case 3:23-cv-00467   Document 34-1   Filed 07/03/23   Page 3 of 34 PageID #: 176

*Donovan v. FBI*,
    579 F. Supp. 1111 (S.D.N.Y. 1983) ................................................................10

*Elec. Priv. Info. Ctr. v. U.S. DOJ Crim. Div.*,
    82 F. Supp. 3d 307 (D.D.C. 2015) ........................................................... 15-16

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C.Cir.1990) ...........................................................................23

*Greenpeace, Inc. v. Dep't of Homeland Sec.*,
    311 F. Supp. 3d 110 (D.D.C. 2018) ................................................................24

*Hopkinson v. Shillinger*,
    866 F.2d 1185 (10th Cir.), *on reh'g en banc*, 888 F.2d 1286 (10th Cir. 1989) .....................12

*In re U.S. DOJ*,
    999 F.2d 1302 (8th Cir. 1993) ................................................................. 13, 15

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) ..........................................................................................5

*Jones v. FBI*,
    41 F.3d 238 (6th Cir. 1994) ..............................................................................9

*Juarez v. U.S. DOJ*,
    518 F.3d 54 (D.C. Cir. 2008) ..........................................................................11

*Jud. Watch, Inc. v. CIA*,
    No. 17-cv-397, 2019 WL 4750245 (D.D.C. Sept. 29, 2019) ................................14

*Jud. Watch, Inc. v. DOD*,
    715 F.3d 937 (D.C. Cir. 2013) ..........................................................................6

*Jud. Watch, Inc. v. FBI*,
    No. 00-cv-745, 2001 WL 35612541 (D.D.C. Apr. 20, 2001) ........................... 11-12

*Jud. Watch, Inc. v. FDA*,
    449 F.3d 141 (D.C. Cir. 2006) ........................................................................22

*Kay v. FCC*,
    976 F. Supp. 23 (D.D.C. 1997), *aff'd*, 172 F.3d 919 (D.C. Cir. 1998) ...................14

*Kidder v. FBI*,
    517 F. Supp. 2d 17 (D.D.C. 2007) ..................................................................14

*Kohake v. Dep't of Treasury*,
    630 F. App'x 583 (6th Cir. 2015) ......................................................................8

iii

*Kuzma v. U.S. DOJ,*
   692 F. App'x 30 (2d Cir. 2017) ...........................................................17

*Lynch v. Dep't of the Treasury,*
   210 F.3d 384 (9th Cir. 2000) ...........................................................17

*Manning v. U.S. DOJ,*
   234 F. Supp. 3d 26 (D.D.C. 2017) ..............................................14, 21

*Mendoza v. DEA,*
   465 F. Supp. 2d 5 (D.D.C. 2006) ......................................................17

*Miller v. U.S. DOJ,*
   562 F. Supp. 2d 82 (D.D.C. 2008) ....................................................25

*Nat'l Archives & Records Admin. v. Favish,*
   541 U.S. 157 (2004) ......................................................................2, 23

*Nat'l Lab. Rels. Bd. v. Robbins Tire & Rubber Co.,*
   437 U.S. 214 (1978) ......................................................2, 10, 11, 14

*Neuhausser v. U.S. DOJ,*
   No. 03-cv-531, 2006 WL 1581010 (E.D. Ky. June 6, 2006) ................23

*North v. Walsh,*
   881 F.2d 1088 (D.C. Cir. 1989) ........................................................15

*Nova Oculus Partners, LLC v. U.S. SEC,*
   486 F. Supp. 3d 280 (D.D.C. 2020) ..................................................23

*Oglesby v. U.S. Dep't of the Army,*
   920 F.2d 57 (D.C. Cir. 1990) ..............................................................8

*Patino-Restrepo v. U.S. DOJ,*
   No. 17-5143, 2019 WL 1250497 (D.C. Cir. Mar. 14, 2019) ................14

*Payne v. U.S. DOJ,*
   722 F. Supp. 229 (E.D. Pa. 1989), *aff'd sub nom. Payne v. U.S. DOJ, F.B.I.,*
   904 F.2d 695 (3d Cir. 1990) ..............................................................10

*Peterzell v. U.S. DOJ,*
   576 F. Supp. 1492 (D.D.C. 1983) ......................................................12

*Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.,*
   740 F.3d 195 (D.C. Cir. 2014) ..........................................................24

*Rimmer v. Holder,*
   700 F.3d 246 (6th Cir. 2012) .........................................................6, 23

iv

*Robbins Geller Rudman & Dowd LLP v. Sec. & Exch. Comm'n,*
    419 F. Supp. 3d 523 (E.D.N.Y. 2019)....................................................................14

*Robbins, Geller, Rudman & Dowd, LLP v. U.S. SEC,*
    No. 14-cv-2197, 2016 WL 950995 (M.D. Tenn. Mar. 12, 2016)...........................21

*Rojem v. U.S. DOJ,*
    775 F. Supp. 6 (D.D.C. 1991) ........................................................................ 10, 12

*Rugiero v. U.S. DOJ,*
    257 F.3d 534 (6th Cir. 2001) ..................................................................... 6, 8, 9, 10

*Schrecker v. U.S. DOJ,*
    349 F.3d 657 (D.C. Cir. 2003) ...........................................................................8

*Shannahan v. IRS,*
    672 F.3d 1142 (9th Cir. 2012) .......................................................................6, 13

*Sharkey v. FBI,*
    No. 16-cv-837, 2017 WL 3336617 (N.D. Ohio Aug. 4, 2017) .................................9

*Solar Sources, Inc. v. United States,*
    142 F.3d 1033 (7th Cir. 1998) ..........................................................................18

*Steinberg v. U.S. DOJ,*
    23 F.3d 548 (D.C. Cir. 1994)..............................................................................8

*U.S. DOJ v. Reporters Comm. for Freedom of the Press,*
    489 U.S. 749 (1989) ........................................................................................23

*Wojtczak v. U.S. DOJ.,*
    548 F. Supp. 143 (E.D. Pa. 1982) ......................................................................10

**STATUTES**

5 U.S.C. § 552.................................................................................................*passim*

28 U.S.C. § 533.....................................................................................................9

28 U.S.C. § 534..................................................................................................3, 9

Freedom of Information Reform Act of 1986,
    Pub. L. No. 99-570, 100 Stat. 3207 (1986) ........................................................15

**REGULATIONS & EXECUTIVE ORDERS**

28 C.F.R. § 0.85................................................................................................3, 9

United States Intelligence Activities,
    Exec. Order No. 12,333, 46 Fed. Reg. 59,941 (Dec. 4, 1981)....................................................9

**RULES**

Fed. R. Civ. P. 56.......................................................................................................................6

**OTHER AUTHORITIES**

Dep't of Just. Press Release, "Friend of Dayton Mass Shooter Charged with Illegally
    Purchasing and Possessing Firearms," Aug. 12, 2019,
    https://www.justice.gov/usao-sdoh/pr/friend-dayton-mass-shooter-charged-illegally-
    purchasing-and-possessing-firearms. ...................................................................................11

Federal Bureau of Investigation, "The Unabomber,"
    https://www.fbi.gov/history/famous-cases/unabomber..........................................................20

Holly Yan, *St. Louis school shooter had an AR-15-style rifle, 600 rounds of ammo and a note
    saying 'I don't have any friends. I don't have any family,' police say*, CNN, Oct. 25, 2022,
    https://archive.ph/DDdqw.................................................................................... 19-20

J. David Goodman, *Walmart Gunman Bought Pistol Hours Before Killing and Left a 'Death
    Note,'* NEW YORK TIMES, Nov. 25, 2022,
    https://archive.ph/MmfAx .......................................................................................20

Kim Kozlowski, *Note written by MSU shooter asked 'why,' outlined other targets*,
    THE DETROIT NEWS, March 10, 2023,
    https://archive.ph/0bMd6.........................................................................................20

Michael Ruiz, *Nashville police to release manifesto in Christian school shooting massacre*,
    FOX NEWS, April 27, 2023,
    https://archive.ph/o8eDD.................................................................................... 18-19

# INTRODUCTION

Plaintiffs' Freedom of Information Act ("FOIA") request seeks the writings of Audrey Hale collected by the Metropolitan Nashville Police Department ("MNPD") as part of its investigation into The Covenant School shooting—what the MNPD and the FOIA request refer to as Hale's "manifesto." The MNPD shared these documents with the Federal Bureau of Investigation ("FBI") to enable the FBI to assist the MNPD's investigation, and so that the FBI could conduct its own investigation into potential violations of federal law. Both the MNPD and FBI investigations are active and ongoing. The MNPD's criminal investigation seeks to determine whether other people were involved in planning the shooting or obtaining the weapons used in the shooting, and if related crimes were committed or were being planned. Likewise, the FBI continues to investigate potential federal crimes, which could include whether underlying bias provided motivation in the attack, or if any co-conspirators or like-minded contacts were involved. Because of these ongoing investigations, the FBI determined that disclosure of the requested documents "could reasonably be expected to interfere with enforcement proceedings" and withheld all responsive records under FOIA Exemption 7(A). 5 U.S.C. § 552(b)(7)(A).

The FBI's assertion of Exemption 7(A) is proper. The records in question are indisputably law enforcement records because they were compiled by law enforcement agencies in the course of criminal investigations that those agencies are conducting. The declarations of FBI Section Chief Seidel and MNPD Lieutenant Gibson establish that those investigations are ongoing, and that disclosure of the records would interfere with those investigations. Specifically, disclosure would provide witnesses in the ongoing investigations and potential defendants in subsequent enforcement proceedings with a trove of information previously unknown to them about the investigations' focus, scope, direction, and strategy. Release of the records sought could tip off potential subjects of the ongoing investigations to their involvement and reveal the extent of the evidence compiled to date. Disclosure could thus enable potential witnesses and defendants to use that information to thwart the ongoing investigations. And that foreseeable harm remains extant

notwithstanding the assailant's death because co-conspirators, such as individuals involved in planning the shooting or procuring weapons, or like-minded contacts may still be criminally liable.

The Freedom of Information Act provides a "means for citizens to know what their government is up to." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004) ("*NARA*") (citation omitted). But "[w]hen disclosure touches upon certain areas defined in the [Act's] exemptions," such as the government's law enforcement priorities, "the statute recognizes limitations that compete with the general interest in disclosure, and that, in appropriate cases, can overcome it." *Id.* at 172. For the reasons stated here and discussed further below, this is such a case: "[T]he release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding was precisely the kind of interference that Congress" designed Exemption 7(A) "to protect against." *Nat'l Lab. Rels. Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 232 (1978).

Because disclosure of the records Plaintiffs seek would jeopardize ongoing law enforcement investigations, Defendant respectfully requests that the Court grant its cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment. If the Court rejects Defendant's assertion of Exemption 7(A) to withhold categorically the requested documents, the Court should nonetheless grant partial summary judgment to allow Defendant to withhold portions of the responsive records under Exemptions 6, 7(C), and 7(F).

## BACKGROUND

## I. THE COVENANT SCHOOL SHOOTING AND ONGOING INVESTIGATIONS

On March 27, 2023, Audrey Hale killed three students and three adults at The Covenant School in Nashville. *See* Compl. ¶ 1, ECF No. 1. Hale died during the shooting. *Id.* ¶ 6. Following the shooting, the MNPD and FBI opened separate investigations into the events of March 27, 2023, summarized below.

*A. The MNPD's Ongoing Investigation.* The MNPD is the principal law enforcement agency of the Metropolitan Government of Nashville. *See* Declaration of Lieutenant Brent Gibson ("Gibson Decl.") ¶ 2. The MNPD has been investigating The Covenant School shooting and

surrounding events since the date of the shooting, March 27, 2023. *Id.* ¶ 6. Lieutenant Gibson is overseeing that investigation, which is being conducted by multiple MNPD officers. *Id.* The MNPD's ongoing investigation concerns, among other issues, "whether the assailant [Hale] … had any assistance with planning the shooting or any assistance with purchasing the weapons that were used in the shooting." *Id.* ¶ 8. Accordingly, Hale's death did not end the investigation: the MNPD still must "determine if related crimes were committed, are being planned, or whether other people were involved." *Id.* ¶ 9.

As part of this investigation, the MNPD has been interviewing witnesses, executing search warrants, and gathering evidence. *Id.* ¶ 7. The MNPD has not, however, had the opportunity to interview everyone connected with the incident or to review all the materials the MNPD has gathered. *Id.* ¶¶ 8, 11. Shortly after Hale was killed, MNPD Chief John Drake stated on March 27, "we have a manifesto, we have some writings that we're going over that pertain to this date, the actual incident." Compl. ¶ 2; Defs.' Answer to Pls.' Compl. ¶ 2, ECF No. 31 ("Answer"); Mem. in Supp. of Pls.' Mot. for Summ. J. at 3, ECF No. 21 ("Pls.' MSJ"). Those writings (the "manifesto") were found in Hale's car on the day of the shooting. Gibson Decl. ¶ 10. The manifesto, and other potential evidence and materials that the MNPD has gathered, compose the MNPD investigatory file for the case. *Id*. ¶¶ 10, 12.

The MNPD provided certain of the investigatory records to the FBI for assistance with the MNPD's ongoing investigation. *Id.* ¶ 10; Declaration of Section Chief Michael G. Seidel ("Seidel Decl.") ¶ 15 n.4. The FBI routinely provides such technical assistance to local law enforcement agencies. Seidel Decl. ¶ 19. Federal law specifically authorizes the FBI to assist local law enforcement agencies in this manner. *See* 28 U.S.C. § 534 (authorizing the FBI to compile crime-related records and to exchange the same with local law enforcement). *See also* 28 C.F.R. § 0.85(g) (specifying that the FBI laboratory may provide "without cost, technical and scientific assistance … for all duly constituted law enforcement agencies"); Seidel Decl. ¶ 19. Hale's "manifesto" was included in the set of materials the MNPD provided to the FBI. Gibson Decl. ¶ 10; Seidel Decl. ¶¶ 15, 27.

*B. The FBI's Ongoing Investigation.* The FBI opened its own investigation into the events surrounding the shooting at The Covenant School. Seidel Decl. ¶ 18. Specifically, the FBI is analyzing the evidence it has compiled, including the requested records, "in part to determine if any federal criminal laws were violated, that potentially could include whether underlying bias provided motivation, or if any co-conspirators or like-minded contacts were involved." *Id.* ¶ 28. That investigation is ongoing: the FBI "still reviewing the records at issue" and the FBI "will continue to analyze any new information to develop additional intelligence and investigative leads." *Id.* Beyond identifying those potential focuses of the investigation, the Seidel Declaration explains that the FBI cannot further describe its investigation without potentially undermining the FBI's investigatory efforts. *Id.* ("[A]dditional detail about the nature and scope of this investigation … could trigger harm to the ongoing investigation as well as ongoing efforts related to evidence, evaluation, and victim/witness management.").

## II. PLAINTIFFS' FOIA REQUEST AND THIS CASE

On April 20, 2023, Plaintiffs submitted a FOIA request to the FBI seeking a copy of "Audrey Hale's Manifesto related to the Nashville Covenant School Shooting on March 27, 2023." ECF No. 1-1 (Compl. Ex. 1) at 1. *See* Seidel Decl. ¶ 5. A few days later, Plaintiffs explained that they were seeking "the notes, journal entries, plans, letters, writings, or other documents making up what law enforcement officials have labeled as Audrey Hale's 'manifesto' related to the Nashville Covenant School Shooting on March 27, 2023." Compl. ¶ 16; ECF No. 1-3 (Compl. Ex. 3); Seidel Decl. ¶ 7.

The FBI denied Plaintiffs' request on April 25, 2023. ECF No. 1-4 (Compl. Ex. 4); Seidel Decl. ¶ 8. The FBI determined that records responsive to Plaintiffs' request are exempt in full from disclosure under FOIA's Exemption 7(A). ECF No. 1-4 (Compl. Ex. 4); Seidel Decl. ¶ 8. That exemption allows a federal agency to withhold "records or information compiled for law enforcement purposes … to the extent that the production of such law enforcement records or information … could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7). The FBI explained that "[t]he records responsive to [Plaintiffs'] request are law

enforcement records; there is a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information could reasonably be expected to interfere with enforcement proceedings." ECF No. 1-4 (Compl. Ex. 4). The FBI also advised Plaintiffs of their right to administratively appeal to the Department of Justice Office of Information Policy ("OIP"). *Id. See also* Seidel Decl. ¶ 8.

On April 25, 2023, Plaintiffs filed an administrative appeal. ECF No. 1-5 (Compl. Ex. 5); Seidel Decl. ¶ 9. Plaintiffs' administrative appeal argued that the FBI's assertion of Exemption 7(A) was improper because "[t]he shooter is dead," and "[n]o crime is being investigated that would lead to a criminal prosecution." ECF No. 1-5 (Compl. Ex. 5) at 5. OIP denied Plaintiffs' administrative appeal on May 5, 2023, concluding that FBI properly withheld the records in full under Exemption 7(A). ECF No. 1-6 (Compl. Ex. 6); Seidel Decl. ¶ 11.

Plaintiffs filed the instant action five days later, on May 10, 2023. *See* Compl. On May 25, 2023, Plaintiffs moved for summary judgment, challenging the FBI's Exemption 7(A) assertion. ECF No. 20. The FBI answered Plaintiffs' complaint on June 26, 2023. ECF No. 31.

## LEGAL STANDARD

The Freedom of Information Act, 5 U.S.C. § 552, provides a means for the public to access federal government records. FOIA requires federal agencies to release records that are responsive to a properly submitted request unless the records (or portions thereof) are subject to any of nine statutory exemptions. *Id*. § 552(a)(3); *see id.* § 552(b)(1)-(9). Although FOIA "strongly favors prompt disclosure, its nine enumerated exemptions are designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of certain types of information.'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)). Accordingly, the exemptions must be given "meaningful reach and application" to achieve the "workable balance" that "Congress has struck" in the Act "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency*, 493 U.S. at 152-53 (citation omitted). The FBI

bears the burden of justifying its decision to withhold records responsive to Plaintiffs' FOIA request, and this Court's review of the FBI's decision is *de novo*. 5 U.S.C. § 552(a)(4)(B).

FOIA cases are typically "decided on summary judgment, since the primary question is a legal one: whether the withheld documents are covered by one of the statutory exemptions." *ACLU of Mich. v. FBI*, 734 F.3d 460, 465 (6th Cir. 2013) (citing *Rimmer v. Holder*, 700 F.3d 246, 255 (6th Cir. 2012)). *See also CareToLive v. FDA*, 631 F.3d 336, 341 (6th Cir. 2011) ("District courts typically dispose of Freedom of Information Act cases on summary judgment based on affidavits from the agency.") (citing *Rugiero v. U.S. DOJ*, 257 F.3d 534, 544 (6th Cir. 2001)). "Summary judgment is warranted where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *ACLU of Mich.*, 734 F.3d at 465 (quoting Fed. R. Civ. P. 56(a)).

"To prevail on summary judgment, the government must show that it made a 'good faith effort to conduct a search for the requested records using methods reasonably expected to produce the requested information' and that any withholding of materials was authorized within a statutory exemption." *Rimmer*, 700 F.3d at 255 (citations omitted). An agency justifies its assertion of a FOIA exemption "through detailed affidavits, which are entitled to a presumption of good faith." *Rugiero*, 257 F.3d at 544. Accordingly, "the court's primary role is to review the adequacy of the affidavits." *Id.* Courts "accord substantial weight to an agency's declarations regarding the application of a FOIA exemption," *Shannahan v. IRS*, 672 F.3d 1142, 1148 (9th Cir. 2012), and "give deference to an agency's predictive judgment of the harm that will result from disclosure of information," *Citizens for Resp. & Ethics in Wash. v. U.S. DOJ* ("*CREW*"), 746 F.3d 1082, 1098 (D.C. Cir. 2014). *See also Rugiero*, 257 F.3d at 544 ("If the Government … adequately states its grounds for nondisclosure, and if those grounds are reasonable and consistent with the applicable law, the district court should uphold the government's position.") (citation omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Jud. Watch, Inc. v. DOD*, 715 F.3d 937, 941 (D.C. Cir. 2013) (citation omitted).

## ARGUMENT

Defendant is entitled to summary judgment on Plaintiffs' claim because the FBI conducted an adequate search and has properly withheld all records responsive to Plaintiffs' FOIA request under Exemption 7(A). Plaintiffs' request sought a specific collection of records described by the MNPD as a "manifesto," and the FBI's search with the specific unit that maintained those records was adequate and proper. So, too, was the FBI's assertion of Exemption 7(A), notwithstanding the fact that the shooter is dead. The FBI and MNPD are law enforcement agencies, and both law enforcement agencies compiled the responsive records as part of their ongoing investigations. Both investigations raise the concrete possibility of enforcement proceedings for violation of state and federal law. Disclosure of the responsive records would reveal the scope, focus, direction, and strategy of the ongoing investigations conducted by both the FBI and MNPD, and alert individuals to their status as potential witnesses and defendants. Potential targets of the investigation (and, ultimately, potential defendants) could use that information to manipulate evidence or evade investigatory efforts. Witnesses, likewise, could use the information that would be released to coordinate their testimony or as basis for refusing to cooperate. Accordingly, public release of the records that Plaintiffs seek would undermine ongoing law enforcement investigations and threaten any future enforcement proceedings.

If the Court rejects Defendant's assertion of Exemption 7(A) to withhold categorically the requested documents, Defendant is nonetheless entitled to partial summary judgment to allow the FBI to withhold portions of the responsive records under Exemptions 6, 7(C), and 7(F). The release of names and identifying information would threaten third parties' privacy interests. Because no countervailing public interest exists in the release of that information, that information is properly withheld under Exemptions 6 and 7(C). And Hale's detailed plans are properly withheld under Exemption 7(F) to prevent a second mass shooting and protect public safety.

## I. THE FBI ADEQUATELY SEARCHED FOR RESPONSIVE RECORDS.

The FBI is entitled to summary judgment on the adequacy of the search. To obtain summary judgment in a FOIA case with respect to the adequacy of the agency's search, an agency

must show that it "has conducted a search reasonably calculated to uncover all relevant documents." *Steinberg v. U.S. DOJ*, 23 F.3d 548, 551 (D.C. Cir. 1994) (citation and quotations omitted). "There is no requirement that an agency search every record system;" rather, the agency must only conduct a good-faith, reasonable search of those systems or records likely to possess the requested information. *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Accordingly, searching for records responsive to a FOIA request is a process that requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," and is "hardly an area in which the courts should attempt to micro-manage the executive branch." *Schrecker v. U.S. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003) (citation omitted). To make the required showing, the FBI "may rely on sworn documents that provide reasonable details concerning the scope of its search." *Kohake v. Dep't of Treasury*, 630 F. App'x 583, 587 (6th Cir. 2015). "In the absence of countervailing evidence or apparent inconsistency of proof, [such affidavits] will suffice to demonstrate compliance with the obligations imposed by the FOIA." *Rugiero*, 257 F.3d at 547 (citation omitted).

There can be no dispute regarding the adequacy of the FBI's search here, and indeed, Plaintiffs do not challenge the adequacy of the search in their motion for summary judgment. *See* Pls.' MSJ. Plaintiffs seek specific records that the FBI obtained from MNPD. Seidel Decl. ¶¶ 15 n.4, 27; Compl. ¶¶ 2-3 (alleging the "manifesto was in the possession of the FBI's Behavioral Analysis Unit" after it was found by the MNPD); Answer ¶¶ 2-3. After confirmation with the relevant custodians and the Memphis Field Office, the FBI's Record/Information Dissemination Section ("RIDS") determined that "the FBI did possess the documents described by Plaintiffs as the 'manifesto.'" Seidel Decl. ¶ 15. And the Seidel Declaration establishes those documents were the records that the FBI identified as responsive to the request: "[o]nce Plaintiffs filed their instant Complaint, …. RIDS coordinated with [the FBI's Behavioral Analysis Unit] to obtain and review the responsive records." Seidel Decl. ¶ 15. Reliance on such subject-matter experts, with actual knowledge and familiarity with the relevant documents, satisfies the FBI's search obligations under FOIA. *See, e.g., Bigwood v. DOD*, 132 F. Supp. 3d 124, 145 (D.D.C. 2015) (upholding

adequacy of "manual searches of [agency's] paper files" by qualified agency personnel, including employees in specific location most likely to possess records); *Sharkey v. FBI*, No. 16-cv-837, 2017 WL 3336617, at *7 (N.D. Ohio Aug. 4, 2017) (search for information "concerning a specific incident" adequate where affidavit establishes "such information would reasonably be expected to be" found through index search) (citation omitted).

## II. THE FBI PROPERLY WITHHELD RECORDS UNDER EXEMPTION 7(A).

Through the Seidel and Gibson Declarations, which are "entitled to a 'presumption of good faith,'" *ACLU of Mich.*, 734 F.3d at 465, the FBI has established that the records Plaintiffs seek (i) were "compiled for law enforcement purposes," and (ii) that their release "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). All responsive records are therefore exempt from disclosure, in full, under Exemption 7(A).

### A. The Responsive Records Were Compiled For Law Enforcement Purposes.

The first requirement to assert Exemption 7(A) is present here: the responsive records were "compiled for law enforcement purposes." *Id.* § 552(b)(7). The Sixth Circuit "has adopted a *per se* rule under which any documents compiled by a law enforcement agency fall within the first part of the section 552(b)(7) exception." *Rugiero*, 257 F.3d at 550 (citing *Jones v. FBI*, 41 F.3d 238, 245 (6th Cir. 1994)). And "the FBI is the archetypical federal law enforcement agency" for purposes of determining whether the Sixth Circuit's *per se* rule applies. *Jones*, 41 F.3d. at 246. The FBI is the primary investigative agency of the federal government, with authority and responsibility to: investigate all violations of federal law not exclusively assigned to another agency; conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and further the foreign intelligence objectives of the United States. *See* United States Intelligence Activities, Exec. Order No. 12,333, 46 Fed. Reg. 59,941 (Dec. 4, 1981) (as implemented by the Attorney General's Guidelines for Domestic FBI Operations); 28 C.F.R. § 0.85; 28 U.S.C. §§ 533 & 534. *See also* Seidel Decl. ¶ 17. Accordingly, because the responsive records were compiled by the FBI as part of its investigation, Seidel Decl.

¶ 18, the responsive records were compiled for law enforcement purposes. *ACLU of Mich.*, 734 F.3d at 466 ("records compiled by the FBI *per se* satisfy this requirement").

That the MNPD provided the responsive records to the FBI initially so that the FBI could assist with the MNPD's ongoing investigation, *see* Seidel Decl. ¶ 15 n.4, does not change this analysis. The MNPD is itself a law enforcement agency, Gibson Decl. ¶ 2, and thus satisfies the Sixth Circuit's *per se* rule for the first prong of the Exemption 7(A) test, *Rugiero*, 257 F.3d at 550. Indeed, where the records sought are "evidence collected by local law enforcement agencies" and subsequently conveyed to the FBI, as in this case, the threshold showing that the records are compiled for enforcement purposes is satisfied. *Payne v. U.S. DOJ*, 722 F. Supp. 229, 231 (E.D. Pa. 1989), *aff'd sub nom. Payne v. U.S. DOJ, F.B.I.*, 904 F.2d 695 (3d Cir. 1990). *See also Rojem v. U.S. DOJ*, 775 F. Supp. 6, 9-10 (D.D.C. 1991) (material state law enforcement agencies provided to the FBI as part of a collaborative effort is "compiled for law enforcement purposes"); *Wojtczak v. U.S. DOJ.*, 548 F. Supp. 143, 147 (E.D. Pa. 1982) ("The Act itself does not say 'records compiled for federal law enforcement purposes' nor does the Act make any distinction between federal and local law enforcement"). "Congress made Exemption 7 applicable to all 'records compiled for law enforcement purposes,'" *Donovan v. FBI*, 579 F. Supp. 1111, 1120 (S.D.N.Y. 1983) ("declin[ing] to construe the scope of Exemption 7 as limited to federal law enforcement"), and the records at issue here were compiled by the MNPD for such purposes, Gibson Decl. ¶ 10.

## B. Disclosure Of The Responsive Records Could Reasonably Be Expected To Interfere With Enforcement Proceedings.

The second prong of the Exemption 7(A) test is satisfied whenever "a concrete prospective law enforcement proceeding [] would be harmed by the premature release of evidence or information." *Robbins Tire*, 437 U.S. at 232 (citation omitted). Exemption 7(A) thus reflects Congress's recognition "that law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case[s]." *Id.* at 224. The records at issue here fall squarely within this category.

### 1. Defendant Has Established The Prospect Of Enforcement Proceedings.

"Exemption 7(A) is temporal in nature," *CREW*, 746 F.3d at 1097: as a general matter, "'when the investigation is all over and the purpose and point of it has expired, disclosure would no longer be an interference with enforcement proceedings,'" *Dickerson v. U.S. DOJ*, 992 F.2d 1426, 1431 (6th Cir. 1993) (quoting *Robbins Tire*, 437 U.S. at 232) (alteration omitted). In the Sixth Circuit, courts reviewing assertions of Exemption 7(A) therefore consider "whether actual enforcement proceedings are still being contemplated." *Id.* Here, the existence of two ongoing investigations establishes that actual enforcement proceedings are still being contemplated. *Juarez v. U.S. DOJ*, 518 F.3d 54, 59 (D.C. Cir. 2008) ("[S]o long as the investigation continues to gather evidence for a possible future criminal case … Exemption 7(A) applies.").

*First*, the FBI maintains an ongoing investigation of the events surrounding the shooting at the Covenant School on March 27, 2023 "to determine if any federal criminal laws were violated, that potentially could include whether underlying bias provided motivation, or if any co-conspirators or like-minded contacts were involved." Seidel Decl. ¶ 28. That Hale died in the attack does not foreclose the future enforcement proceedings against potential co-conspirators or like-minded contacts; indeed, FBI investigations into mass shootings result in enforcement proceedings even in cases where the shooter died. *See, e.g.*, Dep't of Just. Press Release, "Friend of Dayton Mass Shooter Charged with Illegally Purchasing and Possessing Firearms," Aug. 12, 2019, https://www.justice.gov/usao-sdoh/pr/friend-dayton-mass-shooter-charged-illegally-purchasing-and-possessing-firearms.

Accordingly, the FBI's investigation alone establishes the prospect of enforcement proceedings sufficient to satisfy this requirement to invoke FOIA Exemption 7(A), even absent the identification of specific investigatory targets. *ACLU of Mich.*, 734 F.3d at 468 ("Because the FBI has adequately shown … ongoing investigations" through declarations testifying to their existence "the district court properly applied Exemption 7(A)"). *See also Barrett v. U.S. DOJ*, No. 09-cv-02959, 2010 WL 4256366, at *3 (E.D. Cal. Oct. 21, 2010) ("Under Exemption 7(A), a pending criminal investigation constitutes an 'enforcement proceeding.'") (citation omitted); *Jud.*

*Watch, Inc. v. FBI*, No. 00-cv-745, 2001 WL 35612541, at *5 (D.D.C. Apr. 20, 2001) (Exemption 7(A) applies where enforcement "proceedings may become necessary as the investigation progresses").[1]

*Second*, the MNPD's investigation establishes the prospect of enforcement proceedings for purposes of Exemption 7(A), independent of the FBI's investigation. *See* Gibson Decl. ¶¶ 7-9. That "ongoing investigation concerns … whether the assailant at The Covenant School had any assistance with planning the shooting or any assistance with purchasing the weapons that were used in the shooting." *Id.* ¶ 8. That the MNPD investigation concerns potential violations of state criminal law does not preclude the FBI's assertion of Exemption 7(A). "Exemption 7 is not limited only to information gathered for federal law enforcement purposes, but applies with equal force to FBI" records created or maintained "at the request of local law enforcement authorities." *Hopkinson v. Shillinger*, 866 F.2d 1185, 1222 n.27 (10th Cir.), *on reh'g en banc*, 888 F.2d 1286 (10th Cir. 1989). This application of Exemption 7(A) to state and local law enforcement proceedings "encourages cooperation and information sharing between local law enforcement agencies and the FBI." *Id.  see also Rojem*, 775 F. Supp. at 12 ("To hold otherwise would unduly discourage States from enlisting the FBI's assistance on criminal cases."); *Peterzell v. U.S. DOJ*, 576 F. Supp. 1492, 1494 (D.D.C. 1983) ("The release of FBI records in cases such as this would have a negative influence on the long-standing practice of FBI cooperation with state, local, and foreign law enforcement agencies and would tend to thwart effective law enforcement.").

Accordingly, the existence of a "pending" local law enforcement investigation also sufficiently establishes the prospect of enforcement proceedings for purposes of Exemption 7(A). *Butler v. Dep't of Air Force*, 888 F. Supp. 174, 180 (D.D.C. 1995) (ongoing local law enforcement

---

[1] "The FBI need not submit declarations that reveal the exact nature and purpose of its investigations in order to satisfy [] Exemption 7(A)." *Blackwell v. FBI*, 680 F. Supp. 2d 79, 94–95 (D.D.C. 2010), *aff'd*, 646 F.3d 37 (D.C. Cir. 2011) ("Exemption 7(A) exists precisely to shield that sort of revelation."). However, and to avoid any harm to the ongoing investigation, the FBI can provide additional information regarding *in camera* and *ex parte*, should the Court deem it necessary. Seidel Decl. ¶ 28.

investigation justifies assertion of Exemption 7(A) because local agency has "the power to arrest and charge the Plaintiff … and the record shows that the PGCPD investigation is pending"), *aff'd sub nom. Butler v. U.S. AirForce*, 116 F.3d 941 (D.C. Cir. 1997). *See also Barrett*, 2010 WL 4256366, at *5 (upholding assertion of Exemption 7(A) where defendant made a "'general showing' that disclosure of the fingerprints could interfere with *local law enforcement agencies' ongoing investigations*") (emphasis added).

### 2. The Seidel Declaration Properly Identifies Records By Functional Category.

In cases involving Exemption 7(A), particularly where an agency investigation is pending but an enforcement proceeding has yet to be initiated, "the FOIA litigation process threatens to reveal the very information the agency hopes to protect and therefore it may be necessary for the agency affidavit to contain only brief or categorical descriptions of the withheld information." *CREW*, 746 F.3d at 1088 (quotations omitted). For that reason, and also because Exemption 7(A) requires the government to demonstrate only that disclosure "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), "the government is not required to make a specific factual showing with respect to each withheld document that disclosure would *actually interfere* with a particular enforcement proceeding. The [agency] need only make a general showing that disclosure of its investigatory records would interfere with its enforcement proceedings." *Shannahan*, 672 F.3d at 1150 (citation omitted). Thus, "the actual contents of the documents are not relevant when the propriety of Exemption 7(A) is in dispute." *In re U.S. DOJ*, 999 F.2d 1302, 1309 n.3 (8th Cir. 1993).[2]

The Seidel Declaration identifies a single category of withheld law enforcement records: Audrey Hale's writings located in her car and described by the MNPD as a "manifesto." Seidel Decl. ¶ 27. The FBI is able to describe the withheld records with this level of detail because

---

[2] For this reason, a *Vaughn* index describing each responsive record is not required in cases where the agency asserts Exemption 7(A): rather, in such cases, "it does not seem to us that valuable time should normally have to be spent on the preparation and analysis of a *Vaughn* index. As a practical matter, affidavits by people with direct knowledge of and responsibility for the investigation usually ought to suffice." *Dickerson*, 992 F.2d at 1431.

Plaintiffs' narrow FOIA request seeks only a single set of documents—"Audrey Hale's Manifesto related to the Nashville Covenant School Shooting on March 27, 2023." ECF No. 1-1 (Compl. Ex. 1); Seidel Decl. ¶ 5. Courts routinely recognize that the broader categories of evidentiary records and investigative information, both of which encompass the manifesto, satisfy "the requirements for employing the categorical approach." *Jud. Watch, Inc. v. CIA*, No. 17-cv-397, 2019 WL 4750245, at *5 (D.D.C. Sept. 29, 2019). *See also Patino-Restrepo v. U.S. DOJ*, No. 17-5143, 2019 WL 1250497, at *2 (D.C. Cir. Mar. 14, 2019) ("[T]he FBI properly withheld in full its investigative file under FOIA Exemption 7(A)."); *Robbins Geller Rudman & Dowd LLP v. Sec. & Exch. Comm'n*, 419 F. Supp. 3d 523, 533 (E.D.N.Y. 2019) (granting summary judgment where "each type of document in this category served the same purpose: it contains information … related to the Hertz Investigation."); *Kidder v. FBI*, 517 F. Supp. 2d 17, 28 (D.D.C. 2007) (granting summary judgment where categories at issue were "evidentiary or investigatory materials[] and administrative materials"); *Manning v. U.S. DOJ*, 234 F. Supp. 3d 26, 36 (D.D.C. 2017) (same).

Accordingly, the type and category of the record sought articulated in the Seidel Declaration is sufficient to justify the FBI's assertion of Exemption 7(A): no more detail is required for this Court to make the "generic determination[] that … disclosure of particular kinds of investigatory records" would interfere with ongoing investigations and prospective enforcement proceedings. *Agrama v. IRS*, 272 F. Supp. 3d 42, 48 (D.D.C. 2017) (quotations omitted).

### 3. Disclosure Of The Responsive Documents Could Reasonably Be Expected To Interfere With Ongoing Investigations And To Harm Potential Enforcement Proceedings.

"Generally, an agency may establish interference by showing that release of the records would reveal the scope, direction and nature of its investigation," *Kay v. FCC*, 976 F. Supp. 23, 38 (D.D.C. 1997), *aff'd*, 172 F.3d 919 (D.C. Cir. 1998), as "the release of information in investigatory files prior to the completion of an actual, contemplated enforcement proceeding was precisely the kind of interference that Congress" intended Exemption 7(A) "to protect against," *Robbins Tire*, 437 U.S. at 232. The showing of a risk of interference necessary to sustain an agency's assertion of Exemption 7(A) is not demanding: Exemption 7(A)'s legislative history

14

confirms that Congress has established only a modest standard for the showing an agency must make to demonstrate a risk of interference,[3] and courts accordingly require only "some minimally sufficient showing." *In re DOJ*, 999 F.2d at 1309 (quoting *Curran v. U.S. DOJ*, 813 F.2d 473, 475 (1st Cir. 1987)). The Seidel and Gibson Declarations readily make this "minimally sufficient showing" by identifying the very harms that the Sixth Circuit has repeatedly recognized justify an agency's assertion of Exemption 7(A). Seidel Decl. ¶¶ 30-32; Gibson Decl. ¶¶ 11-12.

a. As to the FBI's investigation, Seidel explains that any release of information from the responsive records "would allow potential targeted individuals" to learn "details surrounding the potential criminal activities, the identities of potential witnesses, and the direct and circumstantial evidence of the potential criminal activities." Seidel Decl. ¶ 31. Potential co-conspirators who may not have previously been aware that they were the subject of an investigation could therefore "use the released information to their advantage to destroy evidence, intimidate potential witnesses, and/or evade the FBI's investigative efforts." *Id.* This is the very harm that the Sixth Circuit held sufficient to justify assertion of Exemption 7(A) in *ACLU of Michigan*. In that case, the Sixth Circuit affirmed the FBI's assertion of Exemption 7(A) in reliance on an agency declaration stating that disclosure could "reveal what leads the FBI is pursuing and the scope of those investigations"—as well as "FBI priorities, threat assessments, and vulnerabilities"— thereby "permitting groups to change their behavior and avoid scrutiny." 734 F.3d at 466-67 (a declaration identifying such harms "amply states a type of interference covered by Exemption 7(A)"). *See also Elec. Priv. Info. Ctr. v. DOJ Crim. Div.*, 82 F. Supp. 3d 307, 320-21 (D.D.C. 2015) ("information regarding the scope of this ongoing multi-subject investigation" that could

---

[3] "As amended in 1974, [E]xemption 7(A) required a showing that disclosure 'would' interfere with enforcement proceedings. In 1986, Congress changed 'would' to 'could reasonably be expected to[,]' … [thus] 'reliev[ing] the agency of the burden of proving to a certainty' that disclosure will interfere with enforcement proceedings." *North v. Walsh*, 881 F.2d 1088, 1098 n.14 (D.C. Cir. 1989) (quoting Freedom of Information Reform Act of 1986, Pub. L. No. 99-570, § 1802(a), 100 Stat. 3207, 3207-08 (1986)). *See also In re DOJ*, 999 F.2d at 1307 (describing this change to the statutory text as "lessen[ing] the burden on the government in establishing the application of Exemption 7(A)"); *Dickerson*, 992 F.2d at 1431 n.5, 1433 (similar).

allow "targets of the investigation to evade law enforcement" is "precisely the type of information that Exemption 7(A) protects"); *Alyeska Pipeline Serv. Co. v. U.S. EPA*, 856 F.2d 309, 312 (D.C. Cir. 1988) (sufficient harm where government established "identification of the documents would expose the particular types of allegedly illegal activities being investigated").

The Seidel Declaration identifies three further harms and types of interference following from release of information regarding the scope of the investigation, potential witnesses, and the existing evidence, including: (a) "possible harm to, or intimidation of" witnesses or sources "who possess information related to the investigation"; (b) "the use of released information to counteract evidence developed by investigators, to alter or destroy potential evidence, or to create false evidence;" and, (c) "the use of released information by any potential subject of the investigations to assess the likelihood that he or she may be prosecuted and/or convicted in connection with this investigation." Seidel Decl. ¶ 31. Again, the Sixth Circuit has held Exemption 7(A) exists to protect against these precise harms. *See Dickerson*, 992 F.2d at 1433 (recognizing affidavits warning released information could be used to "tamper with evidence, intimidate witnesses or construct a false alibi" showed sufficient harm); *ACLU of Mich.*, 734 F.3d at 466-67. Indeed, the risk of harm is accentuated here because the FBI's investigation may concern "whether underlying bias provided motivation," Seidel Decl. ¶ 28, and release of the records would enable Plaintiffs to report on motive—which they intend to do, *see* Compl. ¶ 10—thereby ensuring broad dissemination of information regarding the potential focus or scope of the FBI's investigation.

b. Disclosure would cause similar interference with and harm to the MNPD's ongoing investigation. Lieutenant Gibson explained that "[i]f the records were released [in full], they could reveal which individuals are potential witnesses in the investigation or potential defendants in future criminal proceedings." Gibson Decl. ¶ 11. And because the MNPD "has not yet had the opportunity to interview individuals identified" in the responsive records, release in full would destroy the ability of MNPD "to interview those individuals without them having advance notice of how and when they are mentioned in the writings." *Id.* The harm to the MNPD's investigation

and potential enforcement proceedings is therefore that "potential witnesses could shape their testimony in light of the disclosed information" or "decline to cooperate." *Id.* ¶ 12.

Both forms of potential harm to the MNPD investigation that the Gibson Declaration identifies are sufficient to justify assertion of Exemption 7(A). Indeed, the Sixth Circuit has upheld the FBI's assertion of Exemption 7(A) where law-enforcement declarations explained, as in this action, that disclosure would reveal "what investigative leads the [agency] is pursuing, who the prime suspects are, and the nature of the evidence gathered to date," so as to allow potential defendants or witnesses to "tamper with evidence … or construct a false alibi." *Dickerson*, 992, F.2d at 1433. Harm to an ongoing investigation from merely alerting potential witnesses and suspects that they are witnesses or suspects, which would be the effect of release here, also establishes a reasonable expectation of interference. *See Lynch v. Dep't of the Treasury*, 210 F.3d 384, at *2 (9th Cir. 2000) (interference where agency declarations "made clear" that release of records could "alert potential suspects"); *Kuzma v. U.S. DOJ*, 692 F. App'x 30, 35 (2d Cir. 2017) (affirming assertion of Exemption 7(A) where release would "tip[] off the subject of the investigation"); *Mendoza v. DEA*, 465 F. Supp. 2d 5, 11 (D.D.C. 2006) (accepting agency declarations that disclosure could assist targets to avoid apprehension and to develop false alibis); *Ctr. for Nat'l Sec. Stud. v. U.S. DOJ.*, 331 F.3d 918, 930 (D.C. Cir. 2003) (reasonable likelihood of interference where release could render a "potential witness or informant … much less likely to come forward and cooperate with the investigation").

*** 

In sum, the Seidel and Gibson Declarations sufficiently identify harms that "could reasonably be expected to interfere with," 5 U.S.C. § 552(b)(7)(A), the ongoing FBI and MNPD investigations and any ensuing enforcement proceedings. The FBI's determination to withhold records responsive to Plaintiffs' FOIA request under Exemption 7(A) was therefore proper.

17

### 4. Plaintiffs Cannot Overcome Defendant's Showing That Disclosure Is Likely To Harm Ongoing Law Enforcement Proceedings.

Plaintiffs' arguments to the contrary fail. *First*, Plaintiffs assert in a conclusory manner that "[t]here is no criminal investigation, no grand jury investigation, no prosecutor considering charges" because "Hale is dead." Pls.' MSJ at 10. But as explained in the Gibson Declaration, "[e]ven though the assailant died at the school, the criminal investigative file does not automatically, instantly close" because the MNPD must "determine if related crimes were committed, are being planned, or whether other people were involved." Gibson Decl. ¶ 9. The FBI's investigation is likewise ongoing, as the FBI is "still analyzing information for possible violations of federal criminal law," Seidel Decl. ¶ 28, and federal enforcement proceedings follow from investigations of mass shootings even where the shooter died, *supra* 11. These declarations thus establish the existence of prospective enforcement proceedings. *Supra* 11-13.

Indeed, even if the responsive records were compiled as part of now-closed investigations into the deceased assailant, the FBI would still be entitled to assert Exemption 7(A) so long as release of the responsive records would harm a different ongoing investigation—such as the MNPD's investigation into whether the assailant received assistance in planning the shooting or in obtaining the weapons used, Gibson Decl. ¶ 9, or "other spin-off investigations and/or prosecutions," Seidel Decl. ¶ 28. *See Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1040 (7th Cir. 1998) ("Although the appellants are correct that the Government has closed its cases against the specific individuals named in the FOIA request, the information that the Government compiled against them is part of the information that it has compiled for an ongoing investigation.").

The public statements of the MNPD Public Information Office (cited in Pls.' MSJ at 10-11) are not to the contrary. In stating that "the writings from the Covenant shooter are being reviewed for public release," *id.*, the MNPD Public Information Office expressly conditioned the release of those materials on the outcome of its review. Indeed, it further specified that the review "process … will take a little while." *See* Compl. ¶ 20 (quoting Michael Ruiz, *Nashville police to*

*release manifesto in Christian school shooting massacre*, FOX NEWS, April 27, 2023, https://archive.ph/o8eDD. And in litigation, the MNPD has consistently opposed the release in full of Audrey Hale's writings. *See, e.g.*, ECF No. 25-1 at 1 (Metropolitan Government's Brief, *Hammond v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 23-0538-III (Nashville Ch. Ct., May 30, 2023) (arguing "[t]he records should not be produced for the following reasons.")). In any event, even if the MNPD's statements cast doubt on the existence of an ongoing MNPD investigation (they do not), those statements do not undermine the FBI's assertion of Exemption 7(A) in support of the FBI's ongoing investigation. *See* Seidel Decl. ¶ 28.

*Second*, Plaintiffs argue that the release of the assailant's writings "would not interfere" with any ongoing proceeding because the "types of interference" outlined in *Dickerson*, 992 F.2d at 1433, are not present here. Pls.' MSJ at 11-12. But the types of interference that *Dickerson* identifies are precisely the types of interference that the FBI and MNPD declarations invoke here: *Dickerson* emphasizes that "the most obvious risk of interference with enforcement proceedings is that witnesses will be coerced or intimidated into changing their testimony or not testifying at all," which is (one of) the types of interference substantiated here. *See* Gibson Decl. ¶ 12; Seidel Decl. ¶ 31. Nor was the list outlined in *Dickerson* intended to be exhaustive: as the Sixth Circuit later clarified, "by its plain terms Exemption 7(A) does not limit what type of 'interference' may justify withholding." *ACLU of Mich.*, 734 F.3d at 466 ("the class of harms covered by Exemption 7(A) is not so narrow"). Accordingly, "that release of [the requested] information may reveal what leads the FBI is pursuing and the scope of those investigations … amply states a type of interference covered by Exemption 7(A)." *Id.*

Plaintiffs also identify three "mass-shooting events where the manifesto was released after the shooter died." Pls.' MSJ at 12-13. But neither all mass-shooting investigations nor all "manifestos" are alike: that local police[4] concluded the release of brief notes accompanying the

---

[4] None of the articles that Plaintiffs cite (Pls.' MSJ at 12-13) establish that the FBI was involved in investigating the three mass-shooting events in which Plaintiffs assert manifestos were released after the shooter died. *See* Holly Yan, *St. Louis school shooter had an AR-15-style rifle, 600*

shooter would not harm any law enforcement interests in the three instances Plaintiffs identify does not compel the FBI or MNPD to reach the same conclusion as to more voluminous writings pertaining to a different shooting and compiled for different investigations. "Exemption 7(A) explicitly requires a predictive judgment of the harm that will result from disclosure of information, permitting withholding when it 'could reasonably be expected' that the harm will result." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927. By their nature, such predictive judgments depend on the contexts of a given case and investigation: as the Sixth Circuit explained in *ACLU of Michigan*, "[s]imilar information may be treated differently by different field offices, for example, where one has a pending investigation and one has a closed investigation" such that "the use—and sensitivity—of" requested records "will vary depending on local conditions." 734 F.3d at 467 ("More importantly, if we adopted [plaintiff's] reasoning that disclosure of some information requires disclosure of all similar information, agencies would be discouraged from making a good-faith effort to disclose … for fear of estoppel."). Thus, even if Plaintiffs had identified different FBI mass-shooting investigations in which different predictive judgments were made to release similar writings (and they have not), those other investigations do not refute the FBI's assertion of Exemption 7(A) harm here.

Similarly irrelevant is the FBI's decision to publish Ted Kaczynski's manifesto. *See* Pls.' MSJ at 13. The FBI elected to publish a manifesto of the then-at-large Ted Kaczynski in response to his threats (and not in response to a FOIA request) because the Department of Justice determined publication could lead to the identification of the author. *See* Federal Bureau of Investigation, "The Unabomber," https://www.fbi.gov/history/famous-cases/unabomber. Here, however, the assailant and author of the writings in question is neither unidentified nor at large, as Plaintiffs

---

*rounds of ammo and a note saying 'I don't have any friends. I don't have any family,' police say*, CNN, Oct. 25, 2022, https://archive.ph/DDdqw (statements made by "St. Louis police"); J. David Goodman, *Walmart Gunman Bought Pistol Hours Before Killing and Left a 'Death Note,'* New York Times, Nov. 25, 2022, https://archive.ph/MmfAx (release of manifesto by the City of Chesapeake); Kim Kozlowski, *Note written by MSU shooter asked 'why,' outlined other targets*, The Detroit News, March 10, 2023, https://archive.ph/0bMd6 (note released by "MSU police").

themselves emphasize. *See* Compl. ¶ 1. Accordingly, there exists no investigatory benefit to the release of Audrey Hale's writings, and only the significant, foreseeable harms outlined in the Seidel and Gibson Declarations, *supra* 14-17.

**C. No Reasonably Segregable Non-Exempt Information Exists.**

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). The FBI has met that burden here because the Seidel Declaration establishes that no such information exists. As discussed *supra* 14-17, the FBI has concluded that the disclosure of any additional information related to its ongoing investigation could reasonably be expected to interfere with that investigation.

Courts routinely enter summary judgment on the issue of segregability for law-enforcement agencies on the basis of similar affidavits in Exemption 7(A) cases. *See Manning*, 234 F. Supp. 3d at 38 ("The court need not determine the precise scope of an agency's segregation duty when it invokes the categorical approach under Exemption 7(A) because, on [FBI declarations], the court is satisfied Defendants carried out their duty here.); *Robbins, Geller, Rudman & Dowd, LLP v. U.S. SEC*, No. 14-cv-2197, 2016 WL 950995, at *8 (M.D. Tenn. Mar. 12, 2016) (SEC properly determined that responsive records did not contain any reasonably segregable information because of the way the plaintiff phrased its FOIA request, which sought all documents provided by Walmart to the SEC that related to potential criminal violations); *Dillon v. U.S. DOJ*, 102 F. Supp. 3d 272, 298 (D.D.C. 2015) (FBI satisfied segregability obligation through affidavit explaining that segregability was not possible for a majority of records because they were exempt from disclosure in their entirety pursuant to Exemption 7(A)).

The MNPD has determined that release of a redacted version of certain of Hale's writings would not impede the investigation. Gibson Decl. ¶ 15. That, however, does not compel the FBI to reach the same conclusion, and the FBI in fact reached a different conclusion. Different law enforcement bodies may treat information differently "depending on local conditions" and the nature of each agency's investigation. *ACLU of Mich.*, 734 F.3d at 467. Unlike the MNPD's

investigation, the FBI's investigation seeks, *inter alia*, "to determine if any federal criminal laws were violated, that potentially could include whether underlying bias provided motivation, or if any co-conspirators or like-minded contacts were involved." Seidel Decl. ¶ 28. Thus, "[b]ecause the subset of information that the MNPD believes would not impede the MNPD's investigation includes information pertinent to the FBI's investigation of potential federal crimes, the FBI cannot release redacted versions of the records at issue in this case without harming its ongoing investigation." *Id.* ¶ 41. Nor would the ordered release of portions of the materials in the state action—and no such release is certain, as other parties continue to oppose the release of even redacted versions of Hale's writings, Gibson Decl. ¶ 15—require release in this case because "the FBI's use of public-source information in itself may be protected under Exemption 7(A)." *ACLU of Mich.*, 734 F.3d at 466, 468 (explaining that "law-enforcement agencies are awash in a sea of data, much of it public, so a choice to focus on a particular slice of that data directly reveals a targeting priority"). Accordingly, the FBI has sufficiently shown that no segregable, non-exempt information exists.

## III. IF EXEMPTION 7(A) DOES NOT APPLY, THE FBI MAY STILL WITHHOLD PORTIONS OF THE RECORDS UNDER EXEMPTIONS 6, 7(C), AND 7(F).

Even if this Court were to determine that Exemption 7(A) does not apply, this Court should still grant partial summary judgment for Defendant to enable the FBI to withhold: names and identifying information of third parties pursuant to Exemptions 6 and 7(C); and detailed descriptions of Hale's plans for the shooting pursuant to Exemption 7(F).

### A. Exemptions 6 And 7(C) Justify Withholding Names And Identifying Information.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). This exemption applies "not just [to] files, but also [to] bits of personal information, such as names and addresses, the release of which would 'create a palpable threat to privacy.'" *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006) (quoting *Carter v. U.S. Dep't of Com.*, 830 F.2d 388, 391 (D.C. Cir. 1987)).

Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes … to the extent that production of such law enforcement records or information … could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The first requirement for application of Exemption 7(C) is satisfied here: the records at issue were compiled for law enforcement purposes. *Supra* 9-10.

"Once this prerequisite is met, Exemption 7(C) allows an agency to withhold a broader range of information than Exemption 6." *Rimmer*, 700 F.3d at 256. *See also NARA*, 541 U.S. at 165-66 (comparing statutory language of Exemptions 6 and 7(C)). Accordingly, "[w]hen an agency invokes both exemptions, courts 'focus' on Exemption 7(C) because it 'establishes a lower bar for withholding material.'" *Nova Oculus Partners, LLC v. U.S. SEC*, 486 F. Supp. 3d 280, 288 (D.D.C. 2020) (quoting *CREW*, 746 F.3d at 1091 n.2).

The Seidel Declaration establishes the "substantial" privacy interest of third parties who were merely mentioned by name in the investigative records responsive to Plaintiffs' request. Seidel Decl. ¶ 37. And the Sixth Circuit, "along with many others, has recognized" a privacy interest of "third parties mentioned in [investigative] documents, such as witnesses, informants, and investigators." *Rimmer*, 700 F.3d at 257. *See also Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990) ("[T]he mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation.") (citation omitted).

To overcome that privacy interest under Exemption 7(C), Plaintiffs must identify a "significant" "public interest in disclosing the information … to outweigh [the] privacy interests implicated." *Rimmer*, 700 F.3d at 257. No such public interest exists because "'information about private citizens that is accumulated in various government files but that reveals little or nothing about an agency's own conduct' does not further the FOIA's basic purpose of 'open[ing] agency action to the light of public scrutiny.'" *Neuhausser v. U.S. DOJ*, No. 03-cv-531, 2006 WL 1581010, at *5 (E.D. Ky. June 6, 2006) (quoting *U.S. DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772-73 (1989)). *See also Rimmer*, 700 F.3d at 259 ("Even if Plaintiff had … established a significant public purpose, his FOIA challenge would fail, as he cannot show that

the information he seeks would likely advance the public interest.").  Indeed, the stated purpose of the FOIA request—Plaintiffs' intention to report about Hale's motive, Compl. ¶ 10—does not require release of names or identifying information of third parties merely mentioned in Hale's writings.  Thus, there is no public interest in the names and identifying information of third parties tangentially mentioned that the FBI seeks to withhold, and the FBI's assertion of Exemptions 6 and 7(C) is therefore proper.

### B.  Exemption 7(F) Justifies Withholding Detailed Descriptions Of Hale's Plans.

Exemption 7(F) protects from disclosure records or information that, if disclosed, "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F).  This "very broad" exemption "does not require that a particular kind of individual be at risk of harm; 'any individual' will do."  *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 205 (D.C. Cir. 2014) ("*PEER*").  And "[d]isclosure need not *definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices."  *Id.*  This means "*some* risk, not necessarily a *high* risk."  *Greenpeace, Inc. v. Dep't of Homeland Sec.*, 311 F. Supp. 3d 110, 130 (D.D.C. 2018). Nor does Exemption 7(F) require "concrete evidence."  *PEER*, 740 F.3d at 206.  Instead, an agency "need only demonstrate that it reasonably estimated that sensitive information could be misused for nefarious ends."  *Id.*

The Seidel Declaration establishes that the FBI reasonably predicted that the sensitive information withheld here pursuant to Exemption 7(F) could be used for such "nefarious ends." The requested records contain "extremely detailed" "plans and descriptions concerning the planning of an attack against the [Covenant School]."  Seidel Decl. ¶ 39.  The FBI determined that release of these plans "would risk public safety by giving other potential attackers in-depth plans for carrying out a similar attack."  *Id.*  Because Exemption 7(F) protects even information that could be of use in creating an attack plan, *see PEER*, 740 F. 3d at 206 (exempting disclosure of maps that "criminals could use … to determine whether [an] attack[] … would be worthwhile," and to identify "the most attractive target"), it follows *a fortiori* that Exemption 7(F) protects an

attack plan itself.  In sum, the "[c]ourt defers to the agency's assessment of danger," *Miller v. U.S. DOJ*, 562 F. Supp. 2d 82, 124 (D.D.C. 2008), and the Seidel Declaration adequately establishes that release of these portions of the requested records "would endanger the lives or physical safety of the public," Seidel Decl. ¶ 39.

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant summary judgment in its favor and hold the responsive records are categorically exempt under Exemption 7(A).  If the Court rejects Defendant's assertion of Exemption 7(A), the Court should grant partial summary judgment to allow the FBI to withhold portions of the responsive records under Exemptions 6, 7(C), and 7(F).

Dated: July 3, 2023                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       MARCIA BERMAN
                                       Assistant Branch Director

                                       */s/ Alexander W. Resar*
                                       ALEXANDER W. RESAR
                                       N.Y. Bar No. 5636337
                                       Trial Attorney, U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, NW
                                       Washington D.C. 20005
                                       Tel: (202) 616-8188
                                       alexander.w.resar@usdoj.gov

                                       HENRY C. LEVENTIS
                                       United States Attorney
                                       Middle District of Tennessee

                                       ANICA C. JONES, B.P.R. # 025325
                                       Assistant United States Attorney
                                       United States Attorney's Office
                                       719 Church Street, Suite 3300
                                       Nashville, TN 37203
                                       Telephone: (615) 736-5151
                                       Email: anica.jones@usdoj.gov

                                       *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2023, a copy of the foregoing was filed electronically. A copy will be sent to the following, if registered, by operation of the Court's electronic filing system. If not registered, a copy was sent by United States First Class Mail, postage prepaid, to the following:

| | |
|---|---|
| Daniel P. Lennington<br>Lucas T. Vebber<br>Richard M. Esenberg<br>Wisconsin Institute for Law & Liberty, Inc.<br>330 East Kilbourn Avenue, Suite 725<br>Milwaukee, WI 53202<br>Email: dan@will-law.org<br>Email: lucas@will-law.org<br>Email: rick@will-law.org | Matthew J. McClanahan<br>McClanahan & Winston PC<br>P.O. Box 51907<br>Knoxville, TN 37950<br>Email: matt@tennadvocate.com |

   /s/ Alexander W. Resar      
Trial Attorney
U.S. Department of Justice

*Counsel for Defendant*